## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| CONOR HEENAN,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>    Defendant. | CASE NO. 5:24-CV-01423-BMB<br><br>JUDGE BRIDGET M. BRENNAN<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

### INTRODUCTION

Plaintiff Conor Heenan challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 21, 2024, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Aug. 21, 2024). Briefing was completed as of January 2025. (*See* ECF #11). Following review, and for the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for further proceedings consistent with this Report and Recommendation.

### PROCEDURAL BACKGROUND

Mr. Heenan applied for DIB on October 1, 2021, and for SSI on November 9, 2021, alleging he became disabled on September 26, 2020. (Tr. 216-18). The claims were denied initially on February 10, 2022 (Tr. 83, 92) and on reconsideration on November 16, 2022 (Tr. 101, 110).

On December 13, 2022, Mr. Heenan requested a hearing before an administrative law judge. (Tr. 146). On July 12, 2023, Mr. Heenan (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 42-74). On August 8, 2023, the ALJ determined Mr. Heenan was not disabled. (Tr. 14-41). On June 18, 2024, the Appeals Council denied Mr. Heenan's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.981; 416.1481). Mr. Heenan timely filed this action on August 21, 2024. (ECF #1).

FACTUAL BACKGROUND

## I.     Personal and Vocational Evidence

Mr. Heenan was 27 years old when he filed his applications and 30 years old at the hearing. (*See* Tr. 84). He attended two years of college but stopped due to his symptoms. (Tr. 52). He has worked in restaurants as a bartender and server, repaired telephones, and trained for a sales position. (Tr. 69).

## II.    Relevant Medical Evidence

Mr. Heenan has a history of waxing and waning depression and anxiety with symptoms of low energy, fatigue, and amotivation. Medical records show he frequently and consistently attended psychiatric appointments and individual counseling sessions. At these appointments, mental-status examinations were largely normal, with abnormalities mainly noted in Mr. Heenan's mood and affect. (*See, e.g.*, Tr. 280, 283, 288, 289, 291, 294, 298, 316, 350, 360, 368, 375, 382, 390, 398, 406, 413, 418, 423, 430, 460, 487, 585, 691, 723). At times, Mr. Heenan appeared disheveled and unkempt. (Tr. 333, 422, 444, 447). He often admitted to passive suicidal ideation, such as desiring to fall asleep and not wake up but did not have a plan or intent. (Tr. 334, 417,

421, 423, 429, 432, 435, 438, 441, 444, 447, 459, 471, 474, 480, 489). The following summary shows the frequency of Mr. Heenan's mental-health-treatment sessions, the medication changes he underwent to relieve his symptoms, and statements he made to medical providers about his symptoms between late 2019 and 2023:

**2019.** In December, Mr. Heenan met with a mental health nurse practitioner working with Bharat J. Shah, M.D., and reported continued depression, low energy, and amotivation. (Tr. 280). At the time, Mr. Heenan was taking Cymbalta, Effexor, and Abilify for his symptoms.[1] (*Id.*). The nurse ordered him to wean off Cymbalta gradually. (*Id.*). Later that month, Mr. Heenan reported some feelings of depression, anxiety, low energy, and amotivation. (Tr. 281). The nurse directed him to stop taking Cymbalta and gradually increase Effexor. (*Id.*).

**2020.** On January 3, Mr. Heenan expressed concern that the higher dose of Effexor worsened his anxiety. (Tr. 282). The nurse added a prescription for Pristiq[2] and ordered Mr. Heenan to decrease Effexor gradually and continue taking Abilify. (*Id.*). On January 16, Mr. Heenan reported no longer taking Effexor due to increased anxiety. (Tr. 283). The nurse continued Abilify and increased the dose of Pristiq. (*Id.*). On January 31, Mr. Heenan reported

---

[1]     Cymbalta and Effexor are two brand-name medications prescribed to treat anxiety and depression. *See Duloxetine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a604030.html (last accessed May 27, 2025) (Cymbalta); *Venlafaxine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694020.html (last accessed May 27, 2025) (Effexor). Abilify is a brand-name antipsychotic typically prescribed to treat schizophrenia but can be prescribed alongside an antidepressant to treat depression when the antidepressant alone is insufficient. *See Aripiprazole*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a603012.html (last accessed May 27, 2025).

[2]     Pristiq is a brand-name medication prescribed to treat depression. *See Desvenlafaxine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a608022.html (last accessed May 27, 2025).

3

feeling restless with increased feelings of anxiety from taking Abilify. (Tr. 284). The nurse ordered Mr. Heenan to take a lower dose of Abilify for one week and then stop the medication. (*Id.*).

On February 14, Mr. Heenan met with Dr. Shah and reported feelings of depression and anxiety. (Tr. 285). Dr. Shah continued Abilify and Pristiq and added lamotrigine[3] with instructions for Mr. Heenan to double the initial dosage after one week. (*Id.*). On February 28, Mr. Heenan admitted he did not increase the dose of lamotrigine as instructed. (Tr. 286). Dr. Shah directed Mr. Heenan to take 50 mg for one week and increase to 75 mg thereafter. (*Id.*).

On March 16, Mr. Heenan met with Dr. Shah's nurse practitioner and reported some improvement. (Tr. 287). He was directed to increase lamotrigine to 100 mg a day. (*Id.*).

On April 14, Mr. Heenan presented at a telehealth session with Dr. Shah's nurse practitioner and reported feeling down. (Tr. 288). He expressed dissatisfaction with his job that significantly affects his mood. (*Id.*). On April 28, Mr. Heenan and his girlfriend presented at a telehealth session with Dr. Shah's nurse practitioner. (Tr. 289). Mr. Heenan's girlfriend reported he continued to be depressed and anxious, with low energy and motivation. (*Id.*). He expressed feeling no improvement in the past two weeks. (*Id.*). The nurse directed Mr. Heenan to continue Pristiq, gradually stop Abilify, and start Zoloft.[4] (*Id.*).

---

[3]     Lamotrigine is an anticonvulsant prescribed to increase the time between episodes of depression, though it does not treat the actual episodes. *See Lamotrigine, MedlinePlus*, https://medlineplus.gov/druginfo/meds/a695007.html (last accessed May 27, 2025).

[4]     Zoloft is a brand-name medication prescribed to treat depression and anxiety. *See Sertraline, MedlinePlus*, https://medlineplus.gov/druginfo/meds/a697048.html (last accessed May 27, 2025).

On May 12, Mr. Heenan presented at a telehealth session with Dr. Shah's nurse practitioner and reported starting Zoloft two days before the session. (Tr. 290). He agreed to continue his medications to give the Zoloft more time to work. (*Id.*).

On May 26, at Mr. Heenan's telehealth session, he described no improvement with Zoloft. (Tr. 291). The nurse practitioner continued Pristiq and lamotrigine, discontinued Zoloft, and prescribed Rexulti.[5] (*Id.*).

On June 5, Mr. Heenan presented at a telehealth session with Dr. Shah's nurse practitioner and reported doing much better, enjoying work, and feeling happier at home after restarting Abilify. (Tr. 292). The nurse practitioner continued prescriptions for Abilify, lamotrigine, and Pristiq. (*Id.*).

During a telehealth session on June 22, Mr. Heenan reported some feelings of tiredness but did not have any other concerns. (Tr. 293). The nurse practitioner continued his prescriptions. (*Id.*).

On July 2, Mr. Heenan presented at a telehealth session with Dr. Shah's nurse practitioner and reported feeling tired and depressed, with low energy and little motivation. (Tr. 294). The nurse continued prescriptions for Abilify and lamotrigine, discontinued Pristiq, and re-prescribed Cymbalta with instruction to increase the dose after four days. (*Id.*).

---

[5]    Rexulti is a brand-name antipsychotic typically prescribed to treat schizophrenia but can be prescribed alongside an antidepressant to treat depression when the antidepressant alone is insufficient. *See Brexpiprazole*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a615046.html (last accessed May 27, 2025).

During a telehealth session on July 20, Mr. Heenan reported some improvement with the higher dose of Cymbalta. (Tr. 295). He continued to have low energy and motivation but "has been getting more work done." (*Id.*). The nurse practitioner continued his prescriptions. (*Id.*).

On August 3, Mr. Heenan presented at a telehealth session with Dr. Shah's nurse practitioner and described some improvement with medications, including feeling less depressed and anxious, sleeping well, and getting more work done. (Tr. 296). The nurse practitioner continued his medications. (*Id.*).

During a telehealth session on August 25, Mr. Heenan reported taking half the prescribed dose of Cymbalta and felt he was doing "much better." (Tr. 297). He was excited about getting a new job and expressed no concerns at the time. (*Id.*).

On September 21, Mr. Heenan attended a telehealth session with Dr. Shah's nurse practitioner and reported that he stopped taking all medications a week prior. (Tr. 298). He described difficulty with sleep and increased irritability. (*Id.*). Mr. Heenan wanted to minimize the number of prescribed medications, so the nurse practitioner restarted Cymbalta. (*Id.*).

During a telehealth session on October 5, Mr. Heenan stated he had not restarted Cymbalta because the pharmacy had to order it, but he was prepared to pick up the new prescription later that day. (Tr. 299). He described increased depression, low energy, and low motivation. (*Id.*). He stopped working at his new job because "he did not like how pushy they were." (*Id.*).

On October 19, Mr. Heenan participated in a telehealth session with Nurse Kesic-Sellers and reported spending a lot of time in bed and had not started looking for a new job. (Tr. 300). Nurse Kesic-Sellers instructed Mr. Heenan to take 40 mg of Cymbalta for a week and then increase

the dose to 60 mg. (*Id.*). Mr. Heenan presented at another telehealth session on October 26, and reported that Cymbalta helped some, but he continued to experience depression, low energy, and a lack of motivation. (Tr. 301). Dr. Shah continued Cymbalta at 60mg and added a small dose of Effexor. (*Id.*).

On November 4, Mr. Heenan attended a telehealth session for an initial diagnostic assessment with Karen Fleming, a psychologist at Coleman Professional Services. (Tr. 324). There, he described depression so debilitating that he cannot work and reported recent weight gain, low energy, anxiety about the future, inattention, and mild mood swings. (Tr. 330, 337). He also described sleeping most days and not managing his time well. (Tr. 333).

During a telehealth session with Dr. Shah on November 6, Mr. Heenan reported doing better and feeling more motivated but described difficulty getting to sleep. (Tr. 302). Dr. Shah continued prescriptions for Cymbalta and Effexor and added Seroquel[6] to help him sleep. (*Id.*).

On November 11, Mr. Heenan presented at a telehealth counseling session with Ms. Fleming and reported some improvement with medication and complained of low energy, amotivation, low self-esteem, and negative connotations. (Tr. 415). On November 20, , Mr. Heenan told Dr. Shah he was feeling much better with Effexor but still lacked motivation and had little interest in activities. (Tr. 303). Dr. Shah continued his prescriptions for Cymbalta, Effexor, and Seroquel, and added "a very small dose of Abilify." (*Id.*). During a November 25, telehealth session, Mr. Heenan informed his counselor that he felt better hanging out with his girlfriend and helped his mother move but was not motivated to develop a portfolio showcasing his

---

[6]     Seroquel is a brand-name antipsychotic typically prescribed to treat schizophrenia but can be used in conjunction with other medications to treat depression. *See Quetiapine*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a698019.html (last accessed May 27, 2025).

7

programming skills. (Tr. 417). Despite his amotivation, he was willing to take initial steps toward finding work. (Tr. 418).

On December 10, 2020, Mr. Heenan reported to Nurse Kesic-Sellers that he was doing much better but still had low energy and motivation. (Tr. 304). He described sleeping better with Seroquel and said he would restart Abilify that day. (*Id.*). That same day, Mr. Heenan told his counselor he felt better, managed to complete some household tasks, and was maintaining a to-do list. (Tr. 420).

**2021.** On January 21, Mr. Heenan presented at a telehealth session with Nurse Kesic-Sellers and reported doing better since restarting Abilify. (Tr. 305). Nurse Kesic-Sellers continued his medications for Abilify, Cymbalta, Effexor, and Seroquel.

On February 18, Mr. Heenan joined a telehealth session with Dr. Shah and reported doing better but still lacking motivation. (Tr. 306). He stopped taking Abilify because it made him more anxious. (*Id.*). Dr. Shah continued his other prescriptions. (*Id.*).

On March 18, Mr. Heenan presented a telehealth session with Dr. Shah's clinical nurse specialist Melissa Mellinger and reported feeling depressed. (Tr. 307). He stopped taking Seroquel because it made him feel tired the next day. (*Id.*). Subsequently, he slept poorly at night and napped during the day. (*Id.*). Nurse Mellinger continued Cymbalta and prescribed an extended-release version of Effexor. (*Id.*). That same day, Mr. Heenan met with his counselor and reported similar ongoing sleep issues and his struggle to complete household tasks. (Tr. 421).

On April 1, Mr. Heenan presented at a telehealth session with Nurse Mellinger and reported feeling better and having more energy and motivation but had difficulty falling asleep at times. (Tr. 309). Nurse Mellinger continued his medications. (*Id.*). On April 14, Mr. Heenan met

with his counselor and reported accomplishing very little despite feeling "not horrible." (Tr. 423).

He admitted he did not contact Vocational Services because he felt he did not have the energy for

full- or part-time work. (Tr. 424). On April 28, Mr. Heenan described some improvement with

medication. (Tr. 427). During the counseling session, Mr. Heenan recognized his tiredness before

starting tasks was anticipatory fatigue. (*Id.*) ("he realizes that his tiredness in response to the above

tasks [finding work, filing his taxes, and sorting household expenses] comes before he starts

them").

On May 5, at a telehealth session with Nurse Mellinger, Mr. Heenan reported not doing as

well. (Tr. 312). He described a depressed mood, low energy, amotivation, and varied sleep patterns.

(*Id.*). Nurse Mellinger continued Cymbalta and Effexor and prescribed perphenazine. (*Id.*). On

May 12, Mr. Heenan met with his counselor and reported spending most of his time on the couch.

(Tr. 429). He described increased fatigue with the recent medication change. (*Id.*). On May 26, Mr.

Heenan presented at a telehealth session with Nurse Mellinger and reported not doing any better

with the added prescription. (Tr. 314). He described having "too much nervous energy" and

increased anxiety. (*Id.*). Nurse Mellinger continued his prescriptions. (*Id.*). Two days later, Dr. Shah

instructed Mr. Heenan to gradually increase Effexor, gradually decrease Cymbalta, and decrease

perphenazine.[7] (Tr. 316). That same day, Mr. Heenan also met with his counselor and reported

spending most of his time on the couch. (Tr. 432). He endorsed no improvement with the

medication change. (*Id.*).

---

[7]     Perphenazine is an antipsychotic prescribed to treat schizophrenia (a mental illness
that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate
emotions). *See Perphenazine, MedlinePlus*, https://medlineplus.gov/druginfo/meds/a682165.html
(last accessed May 27, 2025).

On June 4, Mr. Heenan presented at a telehealth session with Nurse Mellinger and reported feeling about the same. (Tr. 317). He reported increasing Effexor but did not decrease Cymbalta because no one sent the prescription for the lower dose to the pharmacy. (Tr. 317). Nurse Mellinger discontinued perphenazine as ineffective, decreased the dose of Cymbalta, and continued Effexor with a plan to increase the dose up to 225 mg daily. (*Id.*).

On June 9, Mr. Heenan met with his counselor and again reported spending most of the time on the couch. (Tr. 435). He expressed feeling extremely tired after another medication adjustment and endorsed napping during the day. (*Id.*). On June 11, during a telehealth session with Nurse Mellinger, Mr. Heenan reported feeling the same, with varied and disrupted sleep patterns, low energy, and amotivation. (Tr. 319). He also described struggling to complete household tasks. (*Id.*). Nurse Mellinger continued Cymbalta and increased the dose of Effexor to 150 mg. (*Id.*). On June 23, Mr. Heenan met with his counselor and reported increased energy and increased depression with his recent medication adjustment. (Tr. 438). He described getting caught up on housework and feeling encouraged to search for part-time work. (Tr. 439).

On July 7, Mr. Heenan returned to his counselor and reported difficulty sleeping, napping during the day, and feeling more depressed in the evenings. (Tr. 441-42). On July 12, Mr. Heenan met with certified nurse practitioner Tina Steen for an initial psychiatric visit at Coleman Professional Services. (Tr. 358). He reported some short-term improvement with medications, excessive sleep and appetite, low energy, low motivation, loss of interest, and situational anxiety. (Tr. 358). On July 13, , Mr. Heenan presented for a follow-up telehealth session with Nurse Mellinger and reported doing a little better with the increased dose of Effexor. (Tr. 321). He also described having slightly more energy and motivation but struggled to fall asleep. (*Id.*). According

10

to Mr. Heenan, his poor sleeping patterns affect his day-to-day functioning. (*Id.*). Nurse Mellinger continued Cymbalta and increased the dose of Effexor. (*Id.*). Mr. Heenan declined medication to help him sleep. (*Id.*).

On August 11, Mr. Heenan met with his counselor and described recent stressors including helping his grandmother move, ongoing car troubles, and excessive sleep. (Tr. 444). On August 23, Mr. Heenan met with Nurse Steen and stated his decision to transfer services from Dr. Shah to Coleman Professional Services. (Tr. 366). He reported some improvement with his recent medication adjustment but also described difficulty falling asleep, sleeping excessively, and napping during the day. (*Id.*). Mr. Heenan also indicated his anxiety mostly occurs when he has things to do. (*Id.*). Nurse Steen continued prescriptions for Effexor and Cymbalta and prescribed clonidine for sleep. (Tr. 370). On August 25, Mr. Heenan told his counselor he felt better and more hopeful after switching to Nurse Steen for psychiatric care. (Tr. 447). He explained his intent to apply for disability, stating he feels he would get tired and feel burnt out if he had a job. (Tr. 448).

On September 8, Mr. Heenan reported to his counselor and described feeling exhausted from taking care of his new puppy. (Tr. 450). As a result, he could not handle other tasks, including repairing his car, applying for disability, and taking care of an internet billing issue. (*Id.*). Mr. Heenan described his daily activities as "exhausting." (Tr. 451). On September 22, Mr. Heenan told the counselor he was feeling more depressed. (Tr. 453). Caring for his pets left him so exhausted he could not complete other household tasks. (Tr. 454). He agreed to work with his father to complete his disability application. (*Id.*).

On October 6, Mr. Heenan returned to his counselor's office and again described feeling exhausted. (Tr. 456). On October 27, during a counseling session, Mr. Heenan reported low

energy and amotivation. (Tr. 460). He continued to work on his disability application and started driving his grandmother around to run errands several days a week. (Tr. 459-60).

On November 1, Mr. Heenan met with Nurse Steen and reported clonidine helps him sleep. (Tr. 373). Even so, he also reported sleeping more during the day and feeling more depressed without reason. (*Id.*). Nurse Steen increased his dose of Effexor and continued his other medications. (Tr. 377). On November 3, Mr. Heenan reported to his counselor feeling tired, overwhelmed with tasks, irritable, and sad. (Tr. 462-63). On November 17, Mr. Heenan met with his counselor again and reported having some good days but continued to feel depressed often. (Tr. 466). He expressed concern he would not be approved for disability benefits and was fearful he could not sustain even part-time work. (Tr. 465).

On December 14, Mr. Heenan met with Nurse Steen and described an improved mood with the increased dose of Effexor, but his pharmacy refused to fill the higher dose when he attempted to refill it. (Tr. 380). His depression worsened when he returned to the lower dose. (*Id.*). Nurse Steen continued prescriptions for Effexor, Cymbalta, and clonidine[8], and prescribed a trial of Rexulti for his depression. (Tr. 385). The next day, Mr. Heenan met with his counselor and reported feeling depressed an irritable. (Tr. 468). He described struggling to complete household tasks on account of feeling tired, but also noted he felt his sense of humor returning. (Tr. 469).

__2022.__ During a counseling session on January 5, Mr. Heenan reported feeling happier than he had in a long time when he and his girlfriend visited family in Wisconsin. (Tr. 471). He also

---

[8]      Clonidine is a medication prescribed to treat high blood pressure. *See Clonidine, MedlinePlus,* https://medlineplus.gov/druginfo/meds/a682243.html (last accessed May 27, 2025). The medication has multiple off-label uses, including managing the symptoms of insomnia. *See Clonidine, National Library of Medicine,* https://ncbi.nlm.nih.gov/books/NBK459124/ (last accessed May 27, 2025).

described sleeping a lot, napping every day, and feeling overwhelmed. (Tr. 472). On January 12,

Mr. Heenan returned to Nurse Steen and reported improvements in sleep, depression, anxiety,

and irritability. (Tr. 388). Nurse Steen continued his medications. (Tr. 393). On January 19, Mr.

Heenan underwent another diagnostic assessment through Coleman Professional Services.

(Tr. 342-53). He reported getting enough done around the house to feel useful and felt that

Rexulti was improving his mood. (Tr. 342). Even so, he struggles to do more than a few household

tasks each day. (Tr. 353). Mr. Heenan reported getting 7 to 9 hours of sleep but not feeling rested.

(Tr. 349). He also indicated feeling "on the edge of crashing," described as feeling tired, listless,

and unable to make decisions or decide what to do with himself. (Tr. 342).

On February 23, Mr. Heenan met with Nurse Steen and reported that he stopped taking

Rexulti because though he felt it helped his depression and overall mood, it increased his anxiety.

(Tr. 396). Nurse Steen directed him to restart Rexulti at a lower dose and continued the rest of his

medications. (Tr. 401).

On March 10, Mr. Heenan attended a counseling session and expressed feeling "great"

while on vacation in Florida. (Tr. 474). He noted feeling relief from his symptoms when he is on

vacation or socializing. (Tr. 475). Mr. Heenan described being largely exhausted and unproductive,

with some relatively "better" days. (*Id.*).

On March 24, Mr. Heenan told his counselor he was sleeping six hours a night and

napping less during the day. (Tr. 477). He said his symptoms were "less debilitating" and he was

feeling more productive because he was able to cook dinner, walk his dog, and drive his

grandmother to appointments once or twice weekly. (Tr. 478).

On April 12, Mr. Heenan met with Nurse Steen and reported a recent week-long period of significant depression during which he found it difficult to function or even get out of bed. (Tr. 404). Otherwise, he endorsed medication compliance with improved mood, persistent depression, excessive sleep, and napping during the day. (*Id.*). Nurse Steen increased the dose of Rexulti and continued Mr. Heenan's other medications. (Tr. 409). On April 14, Mr. Heenan met with his counselor and endorsed continued depression, though he felt somewhat better after his recent medication adjustment. (Tr. 480). He reported that his father helped him complete his disability application and he did some housework and care for his pets during the day. (Tr. 481). On April 27, Mr. Heenan told his counselor's office he was feeling somewhat better but more fatigued. (Tr. 483). He described sleeping nine to ten hours a night, taking a two-hour nap during the day, and feeling irritable and anxious in the evenings. (*Id.*).

On May 11, Mr. Heenan visited his counselor and reported feeling stressed about moving from his apartment. (Tr. 486). He had some better days but still felt depressed. (Tr. 487). He returned to see his counselor on May 25 and reported having good and bad days. (Tr. 489). The counselor noted Mr. Heenan is "skilled at making plans and breaking things down into manageable tasks. At times he continues to feel overwhelmed and will take a nap to manage." (Tr. 491). On May 24, Mr. Heenan met with Nurse Steen for a follow-up appointment. (Tr. 583). He reported tolerating the increased dose of Rexulti but continued to feel depressed. (*Id.*). He described increased anxiety at the end of the day, difficulty falling and staying asleep, and napping during the day three to four times a week. (*Id.*). Nurse Steen continued his medications. (Tr. 588).

On June 8, Mr. Heenan returned to his counselor's office and reported starting to feel better after a 4-day period of worsened depression. (Tr. 492). He was not sleeping well, sleeping

14

more during the day, and engaging in minimal daily activity, including taking care of his pets and cooking dinner. (*Id.*). During his next counseling session on June 22, Mr. Heenan arrived late, describing trouble with sleep due to excess caffeine. (Tr. 648).

On July 5, Mr. Heenan attended a follow-up appointment with Nurse Steen, reporting improved sleep with the consistent use of clonidine and improved anxiety. (Tr. 686). He felt his depression was less significant but was still occurring a third of the time. (*Id.*). Nurse Steen increased the dose of Rexulti and continued his other medications. (*Id.*). On July 7, he described feeling generally "antsy and unhappy," and tired after going to the zoo the day before. (Tr. 651).

On August 3, Mr. Heenan met with his counselor and described sleeping eight hours a night but still feeling tired, taking a four-hour nap during the day, and drinking caffeine until 5:00 pm. (Tr. 654). On August 29, Mr. Heenan met with Nurse Steen and reported persistent depression despite an overall improvement in mood. (Tr. 689). He described excessive and disrupted sleep patterns. (*Id.*). Nurse Steen continued his medications. (Tr. 694).

On October 24, Mr. Heenan returned to Nurse Steen's office and reported cutting his dose of Rexulti in half due to evening agitation. (Tr. 697). He felt his overall mood was stable and described working through several bouts of depression. (*Id.*). He estimated he can be productive for one to two hours a day. (*Id.*). Nurse Steen decreased the dose of Rexulti and continued his other medications. (Tr. 703).

On December 20, Mr. Heenan reported his evening agitation resolved with the lowered dose of Rexulti and he felt his anxiety improved overall. (Tr. 705). He was more productive than usual but endorsed constant fatigue, low energy, and amotivation most of the time. (*Id.*). Nurse Steen continued his medications. (Tr. 710).

15

**2023.** By February 22, Mr. Heenan again endorsed feeling restless after dinner. (Tr. 713). He noted his mood was improved but continued to report constant fatigue and excessive sleep. (*Id.*). Nurse Steen continued his medications and instructed him to split the dose of Rexulti. (Tr. 718).

On April 19, Mr. Heenan reported increased depression, a worsened mood, amotivation, a lack of energy, anhedonia, restlessness, excessive sleep, and constant fatigue. (Tr. 721). He described situational anxiety when leaving the house and completing chores. (*Id.*). Nurse Steen directed Mr. Heenan to wean off and discontinue Effexor, prescribed Prozac[9] to replace Effexor, and continued his other medications. (Tr. 726-27).

## III. Opinion Evidence

On February 9, 2022, state agency reviewing psychologist Joel Forgus, Ph.D., conducted the initial review. He opined Mr. Heenan had mild limitations in understanding, remembering, and applying information and interacting with others and moderate limitations in concentration, persistence, and pace, and adapting or managing himself. (Tr. 78, 87). Dr. Forgus described his findings:

> The claimant has a lengthy history of severe depressive symptoms that are stable but persistent, despite ongoing therapy and many different trials of psychiatric medications. However, the medical evidence does not support a finding that he would not be able to sustain basic work activities. The claimant's statements regarding impairment-related functional limitations are partially consistent with the objective medical and other evidence in the case record. He has severe mental impairments that do not meet/equal a listing. The preponderance of the evidence indicates that he may be somewhat restricted by symptoms but would not be wholly compromised in his ability to function in a work setting.

---

[9]    Prozac is a brand-name medication prescribed to treat depression. *See Fluoxetine*, *MedlinePlus*, https://medlineplus.gov/druginfo/meds/a689006.html (last accessed May 23, 2025).

(Tr. 79, 88). He opined Mr. Heenan can understand, remember, and carry out detailed but not complex instructions; maintain concentration, persistence, and pace; complete work throughout a regular workweek; adjust to routine changes; and manage his emotions and symptoms within a routine work setting. (Tr. 80, 89).

On October 25, 2022, Mr. Heenan met with E.M. Bard, Ph.D., for a consultative psychological examination. (Tr. 603). Dr. Bard determined Mr. Heenan was not limited in his ability to understand, remember, and carry out instructions or to sustain concentration and persistence in work-related activities at a reasonable pace, and also noted there was no history to suggest Mr. Heenan would have problems dealing with authority figures. (*Id.*). Last, Dr. Bard determined Mr. Heenan was limited in his ability to deal with normal pressures in a competitive workplace:

> At the present time, the claimant's performance in this area of functioning is below average, due in part, to his mental health status specifically related to symptoms of depression that he reports have been present for many years. He indicates that symptoms of depression caused him to drop out of college and that he could not complete his four-year degree. Symptoms of depression have also caused him to be uncomfortable trying to handle responsibilities when repairing electronic equipment for customers. Symptoms of depression have caused him to quit some of his employment positions in the past, and symptoms of depression have caused the claimant to experience suicidal ideation as recently as one week ago. Thus, the claimant's abilities to deal with normal pressures in a competitive work setting appear to be below average and compromised at the present time by his long history of dysphoria.

(*Id.*).

On November 15, 2022, state agency reviewing psychologist Katherine Fernandez, Psy.D., conducted the reconsideration review. She determined her findings on reconsideration were consistent with the initial findings and affirmed Dr. Forgus' opinion. (Tr. 99, 108).

17

## IV.     Testimonial Evidence

At the hearing, Mr. Heenan testified he dropped out after two years of college because he was struggling with depression and anxiety. (Tr. 52). He had a bad reaction to the medication prescribed to treat those issues, resulting in a "total breakdown" of his ability to accomplish tasks, and stopped attending classes. (*Id.*). He cannot work because he has low energy and cannot guarantee regular attendance. (Tr. 55). Some days he has brain fog and would likely make mistakes that cause stress for everyone else. (*Id.*). He also has anxiety "about everything that could go wrong." (Tr. 65).

Mr. Heenan takes medications for his conditions and experiences side effects including a lowered sex drive and extreme thirst. (Tr. 58). His antidepressants make him feel "flat and gray." (*Id.*). His medications are effective to some extent, but he has never been on a combination of medications that make his symptoms manageable. (Tr. 62-63). His medication is often adjusted because his prescriptions stop working or become less effective. (Tr. 63). For several weeks after medication adjustments, Mr. Heenan has a higher risk for increased symptoms. (*Id.*).

Mr. Heenan also described sleeping a lot. (Tr. 60). He experiences fatigue and excessive daytime sleepiness. (Tr. 61). He struggles to finish household tasks because he feels an overwhelming need to lie down once he starts them, stating, "I just end up way more tired than I should be when I'm trying to do something like the dishes." (*Id.*). At times, he compensates by drinking lots of coffee, resulting in a disrupted sleep schedule. (*Id.*).

Mr. Heenan lives with his girlfriend. (Tr. 47). He can perform household chores such as dishes, laundry, yardwork, vacuuming, cooking, and caring for his pets. (Tr. 59). He visits with friends about once a week. (*Id.*). Mr. Heenan can also drive, play video games, go out to eat, and go

18

on vacations. (Tr. 60). He finds it daunting to keep up with personal hygiene, like showering and brushing his teeth on a regular basis. (Tr. 64-65). When he is struggling with a particular task, conversation, or social situation, he will remove himself from the situation. (Tr. 66). Mr. Heenan stated:

> I've had numerous plans over the years of things that were supposed to turn my life around and get me into a job that paid me well enough and used the training that I've had. And after years of working and telling myself that I'm going to make enough money to go back to school or teach myself or just do something to take a step up, I've never been able to do it. And all the while, my home is falling apart around me. My girlfriend works a lot, and she is stressed out by it. I am stressed out by it. But there is a bin of dirty dishes in the other room, and I just can't keep up with it.

(Tr. 67). Concluding his testimony, he described himself as a burden for his family:

> I can't have my retired parents go back to work or something and kill themselves trying to support me. I know it's going to ruin my girlfriend's life at a certain point. And I don't know if it's homelessness or just removing myself from the situation entirely, but if something doesn't change over the next year or two, then this – there is probably a chance I won't survive.

(Tr. 68).

The VE testified a person of Mr. Heenan's age, education, and work experience who is subject to the functional limitations described the in the ALJ's residual functional capacity (RFC) determination could work as a sorter, router, and non-postal mail clerk. (Tr. 70). The VE stated employers do not tolerate off-task time beyond 15% of the workday and tolerate no more than one to one-and-a-half days of absence per month. (Tr. 71).

### STANDARD FOR DISABILITY

Eligibility for benefits depends on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

19

which has lasted or can be expected to last for a continuous period of not less than 12 months."

20 C.F.R. §§ 404.1505(a), 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520, 416.920—to determine whether a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is the claimant's residual functional capacity and can claimant perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Heenan had not engaged in substantial gainful activity since September 26, 2020, the alleged onset date. (Tr. 19). At Step Two, the ALJ identified Mr. Heenan's severe impairments as follows: major depressive disorder, anxiety, and fatigue and

20

excessive sleepiness. (*Id.*). At Step Three, the ALJ found Mr. Heenan's impairments did not meet the requirements of, or were not medically equivalent to, a listed impairment. (Tr. 22-24).

At Step Four, the ALJ determined Mr. Heenan's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift up to 20 pounds occasionally; lift/carry up to 10 pounds frequently; stand/walk for up to six hours and sit for up to six hours in an eight-hour workday, with normal breaks and with the allowance to alternate sitting or standing positions for up to two minutes, at 30-minute intervals without going off task; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; work is limited to simple, routine, repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few workplace changes; no interaction with the public; and only occasionally interaction with coworkers and supervisors.

(Tr. 21). The ALJ determined Mr. Heenan cannot perform any past relevant work. (Tr. 34). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Mr. Heenan can perform, including sorter, router, and non-postal mail clerk. (Tr. 36). Therefore, the ALJ found Mr. Heenan was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is a "term of art" used to describe how courts review agency factfinding. *Biestek v. Berryhill,* 587 U.S. 97, 102 (2019) (citation omitted). Under that standard, a court looks to an existing administrative record and asks whether

it contains sufficient evidence to support the agency's factual determinations. *Id.*, 587 U.S. at 102-03 (citation omitted). It is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Along with considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and

thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.")

## DISCUSSION

Mr. Heenan challenges the ALJ's RFC, arguing "the ALJ failed to adequately assess [his] ability to sustain [unskilled light work] as a result of his severe mental impairments." (ECF #8 at PageID 787). He claims the ALJ "mischaracterize[d] compelling evidence of the nature and severity of [his] impairment-related limitations and fail[ed] to adequately portray his ability to sustain even unskilled work on a sustained basis, particularly through the lens of guidance provided by [Social Security Ruling] 85-15." (*Id.* at PageID 790). In particular, Mr. Heenan contends the ALJ mischaracterized evidence of improvement with medication and his ability to engage in daily activities. (*Id.*). The Commissioner disagrees, claiming substantial evidence supports the ALJ's RFC finding. (ECF #11).

## I.  Guiding Principles for Evaluating a Claimant's RFC

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from the claimant's impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* §§ 404.1546(c), 416.946(c). The RFC

must be based on all relevant record evidence, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

As part of the RFC assessment, the ALJ must evaluate the claimant's statements about asserted symptoms. Evaluating an individual's subjective symptoms is a two-step process. Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.*

In evaluating the limiting effects of the claimant's symptoms, the ALJ must consider all evidence in the record including: daily activities; the location, duration, and frequency of the alleged symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; treatment other than medication; other efforts made to alleviate the symptoms; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2. An ALJ need not accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as

24

his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006). In practice, this means the ALJ must make clear to the claimant and those reviewing the decision why the ALJ rejected probative evidence supporting a finding of disability. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (stating that ALJ's failure to explain more, aside from a conclusory analysis, denotes a lack of substantial evidence, even where the record may justify the ALJ's conclusion).

The regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10. The ALJ need not use any "magic words," so long as the decision as a whole is clear why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's findings are generally accorded deference because the ALJ can observe the claimant's demeanor during the administrative hearing. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

## II.     The ALJ's RFC Analysis

The ALJ first detailed Mr. Heenan's statements concerning the intensity, persistence, and limiting effects of his mental impairments:

> The claimant testified that he lives with his girlfriend. He has known her for seven years and has lived with her for three years. He met her on a dating site. His girlfriend

25

works as a social worker. He has a driver's license and last drove the day before. Over the past 12 months, he has driven to the grocery store, errand running, appointments in Kent, and events with his girlfriend, such as going to friends' houses to game and/or eat, going out to eat, going to Dave and Buster's, going to watch fireworks, and going to Cincinnati to visit his girlfriend's friends. He drives his grandma around. He went with his mother to Rhode Island about a month ago. They drove and it took 14 hours to get there. They stayed for four days to go to his niece's graduation and attend family pre-graduation events. He built a garden this year and got seeds. He went to his girlfriend's dad's work twice. He attended Ohio University from 2011 to 2013, studying computer science. He left school due to struggling with depression and anxiety. His girlfriend takes care of the bills. He was donating plasma for money, $65 per donation. In the last 12 months, he donated seven or eight times. When he donated plasma, it would take about two hours and there were other people in the same room donating, up to a couple of dozen people. The biggest reason he cannot work full-time is low energy and no guarantee that he will show up. He has fatigue and excessive sleepiness daily. He has a sleep study coming up. His fatigue/sleepiness manifests in a typical day by his body slumping, needing to lie down, drinking a lot of coffee to stay awake, and being too tired to do anything so he does video games and streaming services. He takes medication for his mental health. They are effective for his symptoms, but not manageable. The medication stopped working and he had to change medications. He has negative thoughts always. He has brain fog that he cannot do anything about. He goes out to eat with his mother, but he could not do that regularly. When he goes to an event with his girlfriend, she knows sometimes that he cannot drive since he had an accident of his own fault in 2016. He lacks attention. In the last 12 months, he has had to cancel with his grandmother and his girlfriend for social obligations or events. He does not shave or shower as he should, and it is daunting to brush his teeth. He has anxiety about things that could go wrong, such as when doing errands. The house is a wreck. He was using alcohol to mitigate his symptoms, which made it more bearable to complete tasks. He gets away from social situations when his skin is crawling. He signed up to do Door Dash but cannot do it. The last time he drank alcohol was three days ago when he had four beers with his girlfriend at home. His medications cause side effects of low sex drive, thirst, and emergency urination. He feels flat and gray on the medication. He does household chores of dishes, laundry, gardening, lawn mowing, and vacuuming. He cooks. He takes care of their pets, one dog and two cats, feeding them etc. He spends five hours a day online and spends a half-hour talking to people on imagine sharing. He visits with friends in person one time a week at their house or his, and they play video games, go out to a bar, or goes walking and hiking trails. At the end of the hearing, the claimant made statements suggesting that if he does not get awarded benefits, he would likely commit suicide.

(Tr. 22) (cleaned up).

26

After the ALJ summarized the medical evidence, he determined Mr. Heenan's impairments could reasonably be expected to produce the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of his symptoms "are not entirely consistent with the medical evidence and other evidence in the record," stating as follows:

The record shows the claimant has a self-reported long history of depression and anxiety. His longitudinal treatment during the period at issue shows improvement in symptoms with medications, although with some compliance issues and increased symptoms reported at those times. For almost the first year of the period at issue, and in the year prior to, there were several changes to the claimant's medications, including stopping and starting different medications on an almost weekly/monthly basis; however, once he established with a new provider and there was more consistency with his medications, outside of his own compliance issues, the claimant repeatedly reported feeling better and improvement in symptoms. Other than flat affect and mood varying between ok/better and depressed or anxious, mental status examination findings were normal throughout, including normal eye contact, normal speech, normal language, normal orientation, normal fund of knowledge, normal associations, intact memory, logical thought process, though content within normal limits, cognition within normal limits, intact/fair insight and judgment, and no suicidal ideation but some reports of passive suicidal thoughts with no plan or intent. There were repeated reports of poor sleep and tiredness in the treatment notes, however, the record also suggests poor sleep hygiene, such as drinking caffeine until late in the afternoon, staying up and playing video games for hours before going to bed, playing video games at times when awakening during the night, napping for several hours during the day, and lacking a daily routine, including a bed time and an awakening time. He has also not taken his medication for sleep as prescribed on a consistent basis despite his reports of improvement in sleep when he did take it more consistently. The claimant eventually sought evaluation with a primary care provider regarding his fatigue/sleepiness in January 2023. Bloodwork was normal and he was referred for a sleep study but has not yet followed through.

Moreover, the claimant has maintained overall normal activities of daily living that are inconsistent with his asserted level of limitations, including regularly doing household chores and preparing meals, mowing the lawn, running errands, shopping, managing his finances, managing his appointments and medications, handling personal grooming independently, and driving. He has repeatedly discussed caring for his pets, including a new puppy he and his girlfriend got in August 2021. He reported on many occasions that he was driving his grandma around one or two times a week for appointments and grocery shopping. He repeatedly indicated spending several hours in a typical day playing video games and being on-line doing things such as YouTube and talking with friends/others. He reported taking at least

27

three trips during the period at issue, one to Florida with his girlfriend for vacation, one to Cincinnati to visit his girlfriend's friends, and one to Rhode Island with his mother for his niece's graduation. He has also reported various activities throughout the period at issue, such as going to gaming events, Busters, going to eat at friend's houses, going out to eat with his mother, going to the zoo, joining a gaming club, going to donate plasma for money seven or eight times in the last 12 months, built a garden, running for exercise, hiking and going on walks, and getting a new house with his girlfriend, moving, and unpacking. He stated he just wants to be a house husband.

I have considered the claimant's anxiety and depression, as well as assessments of "fatigue" and "excessive sleepiness," along with his subjective statements to his providers and the Agency, the consistent normal mental status examination findings, and his overall normal activities of daily living, in finding him capable of light unskilled work with postural and hazard limitations, no fast-paced production requirements, and few workplace changes. He has also made intermittent complaints of irritability, which have been considered, along with his depression and anxiety with repeated notes of flat affect and varying moods on mental status examinations, in limiting his interaction with the public, coworkers, and supervisors. I also note the claimant's admission that he did not have any issues interacting with others or customers in his previous jobs.

(Tr. 32-33). In sum, the ALJ found Mr. Heenan's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with his reported improvements with medication, his daily activities, and his largely normal mental status examinations. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### A. Substantial evidence does not support the ALJ's findings concerning improvement with medication.

When evaluating whether symptom intensity and persistence affect the individual's ability to perform work-related activities the ALJ must consider an individual's attempts to seek treatment for symptoms and to follow treatment once prescribed. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *8. According to the regulations, "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an

individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p, 2017 WL 5180304, at *8 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). If the frequency or extent of treatment is not comparable with the degree of the individual's complaints, or if the individual does not follow prescribed treatment that might improve symptoms, the ALJ may find that the alleged intensity and persistence of the individual's symptoms are inconsistent with the overall evidence of record. *Id.* Before making that finding, the ALJ must (i) consider reasons the individual may not comply with treatment or seek treatment consistent with the degree of complaints and (ii) explain how the ALJ considered the individual's reasons in his evaluation. *Id.* at *8-9; *see also Dooley v. Comm'r of Soc. Sec.*, 656 F.App'x 113, 119 (6th Cir. 2016) (holding that before drawing an adverse inference from the claimant's lack of medical treatment, the ALJ must consider the reasons the claimant may not comply with or seek treatment consistent with the degree of complaints). Relevantly, adverse side effects are a reasonable excuse for a claimant to interrupt a prescribed treatment regimen. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017), *aff'd*, 587 U.S. 97 (2019); *see also* SSR 16-3p, 2017 WL 5180304, at *9.

The ALJ's analysis on noncompliance with treatment deviates from these standards. First, the ALJ noted Mr. Heenan's reported reasons for interrupting his prescribed treatment (*see, e.g.*, Tr. 26 ("difficulty with filling Effexor, so he had been taking a lower dose"); Tr. 27 ("He stopped taking Rexulti on his own again, as the higher dose increased his anxiety"); Tr. 30 ("cut his dose of Rexulti in half due to agitation in the evening")) but drew an adverse inference from failure to follow prescribed treatment without explaining how he considered Mr. Heenan's reasons in the evaluation. As another example, Mr. Heenan is prescribed clonidine as needed for sleep. (*See, e.g.*,

Tr. 718). The medication helps him sleep but he does not take it consistently and described feeling more tired and napping the next day. (Tr. 373, 377, 654).

Second, the ALJ's conclusion that Mr. Heenan "repeatedly reported feeling better and improvement in symptoms" except when he was not compliant with his medications is not supported by substantial evidence. On rare occasion, Mr. Heenan reported improvement in all symptoms while taking his medications as prescribed. (Tr. 388, 686). But, as the ALJ's summation of the medical record indicates, Mr. Heenan typically reported a combination of worsened and improved symptoms (*see, e.g.*, Tr. 302, 303, 304, 306, 342, 358, 366, 415, 466, 472, 475, 483, 487-89, 713) and he often reported worsened symptoms even when he took all medications as prescribed (*see, e.g.*, Tr. 373-77, 404, 583, 689, 705, 713, 721). The psychiatric records, counseling records, and Mr. Heenan's testimony demonstrate his symptoms, including low energy, amotivation, loss of interest, disturbed sleep patterns, and fatigue, are constants in his life, though they wax and wane in severity.

Although the substantial evidence standard is deferential to the Commissioner, that deference is not without limit. An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). Because the ALJ did not consider why Mr. Heenan did not comply with treatment or seek treatment consistent with the degree of complaints as required by the Commissioner's regulations and the ALJ's findings about Mr. Heenan's non-compliance were lacking, I conclude substantial evidence does not support the ALJ's conclusion that Mr. Heenan's symptoms improved except when he did not take his medications as prescribed.

**B.     Substantial evidence does not support the ALJ's characterization of the scope of Mr. Heenan's daily activities.**

In addition to largely normal mental-status examinations and Mr. Heenan's reported improvement, the ALJ discounted statements concerning the intensity, persistence, and functional effects of Mr. Heenan's symptoms because he regularly maintained overall normal activities of daily living that are inconsistent with his asserted level of limitation. (Tr. 32). Mr. Heenan contends the ALJ mischaracterized evidence of his daily activities. (ECF #8 at PageID 790). I agree.

At the hearing, the ALJ questioned Mr. Heenan about the household chores he did in the past 12 months. (Tr. 58). Mr. Heenan listed dishes, laundry, gardening, mowing the lawn, vacuuming, cooking, and taking care of the pets. (*Id.*). In addition to performing household chores, Mr. Hennen testified to spending time with his girlfriend and his mother; taking several trips during the period at issue; visiting with friends about once a week during which they go to bars, play video games or attend gaming events, or hang out at one of their homes; and when he is too tired to do anything he engages in idle activities, such as playing video games, watching programs, or sitting outside. (Tr. 60, 62). Mr. Heenan also testified he sleeps a lot. (Tr. 60).

Importantly, most of this testimony reflects what Mr. Heenan did over a year-long period or the entire period at issue, not what he does typically on a daily or weekly basis. When considered in that context, the activities the ALJ cites are more than "somewhat minimal." And "the ALJ's description not only mischaracterizes [Mr. Heenan's] testimony regarding the scope of his daily activities, but also fails to examine the physical effects coextensive with their performance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 248-49 (6th Cir. 2007). Although the ALJ did not elicit testimony about how often Mr. Heenan engaged in most of those activities, how long it takes him to complete tasks, or how long he can persist, the record does contain some

31

relevant information. For instance, Mr. Heenan often told providers that he stays on the couch most of the time, naps often during the day, and struggles to complete minimal household tasks. (*See, e.g.*, Tr. 319, 321, 353, 421, 423, 429, 432, 435, 441-42, 450, 469, 492, 583, 654, 697, 705, 721). He twice described staying in bed during days-long periods of significant depression. (Tr. 404, 492). Even when Mr. Heenan's symptoms are "less debilitating," his productivity is limited. (*See, e.g.*, Tr. 478 ("able to cook dinner, walk his dog, and takes his grandmother to an appointment and/or shopping one or two times a week"); Tr. 697 ("able to have 1-2 productive hours around the new house per day")). The ALJ acknowledged many of Mr. Heenan's reported functional limitations, but apparently rejected those statements because Mr. Heenan did not consistently take medication shown to improve sleep. (Tr. 32). As described above, the ALJ did not explain how he considered Mr. Heenan's reason for not taking his sleep medication consistently and thus erred in discounting his statements concerning the intensity, persistence, and limiting effects of his symptoms. An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407.

  **C.**  **The ALJ's analysis fails to consider Mr. Heenan's response to the demands of work.**

  Also relevant to the ALJ's determination in this case is SSR 85-15, which provides guidance for the ALJ's assessment of the RFC for a claimant with solely non-exertional impairments, such as a mental impairment, that do not meet or equal a listing. SSR 85-15, 1985 WL 56857 (Jan. 1, 1985). "Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform

unskilled work." *Id.* at *4. The basic mental demands of competitive unskilled work include the abilities (on a sustained basis) to: understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. *Id.* The Ruling recognizes that persons with mental impairments may have difficulty accommodating to the demands or "stress" of work and work-like settings. *Id.* at *6. Individuals with mental impairments may cease to function effectively when facing demands such as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. *Id.* As such, the RFC must reflect any impairment-related limitations caused by the individual's response to the demands of work. *Id.*

In this case, the consultative examiner opined Mr. Heenan's ability to deal with normal pressures in a competitive work setting was below average, supported historically and more recently by Mr. Heenan's statements about his depression at the examination, including dropping out of college, feeling uncomfortable with handling responsibility, quitting past employment positions, and experiencing suicidal ideation. (Tr. 608). The ALJ found the opinion unpersuasive:

> While the opinion is overall supported by the examination interview and normal mental status examination findings, it is not consistent with the record as a whole. The claimant has continued to report depressive symptoms and problems with sleep despite medication management and counseling but has also repeatedly reported improvement in his symptoms with medications. He has had several adjustments and changes to his medication throughout the period at issue. There have been some noted medication compliance issues. Mental status examination findings have been normal throughout other than flat affect and varying moods, including ok/better to depressed and anxious. He has not reported any problems getting along with others or authority figures, although did at times report some irritability with no outbursts or aggression.

(Tr. 33-34).

33

Under the regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. *Id.* §§ 404.1520c(1)-(5), 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors," supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a). With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion, the more persuasive the medical opinion will be. *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). Regarding consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). An ALJ must explain how he considered those factors and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *Id.* §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3).

The ALJ addressed both the supportability and consistency of the consultative examiner's opinion with the other evidence of record, as the regulations require. But as described above, substantial evidence does not support the ALJ's determination that Mr. Heenan improved with medication and the ALJ's finding on medication noncompliance is flawed because the ALJ failed

34

to explain how he considered Mr. Heenan's reasons for not taking his medication as prescribed, an inquiry the ALJ must make before discounting a claimant's symptoms-related statements on that basis. Those flaws are equally detrimental to the ALJ's analysis of the consultative examiner's medical opinion. As a result, remand is warranted unless the ALJ's error was harmless.

## III.    Harmless Error Analysis

The ALJ both failed to follow the Social Security Administration's rules and regulations concerning Mr. Heenan's compliance with prescribed treatment and mischaracterized the scope of his daily activities. That said, the ALJ's symptoms analysis is subject to harmless-error analysis. *Ulman*, 693 F.3d at 714 (citation omitted). If substantial evidence remains to support the ALJ's symptoms-analysis conclusions and the errors do not negate the validity of the ALJ's ultimate conclusion, the error is harmless and does not warrant remand. *Id.* (citation omitted).

Here, the remaining evidence supporting the ALJ's symptoms analysis under SSR 16-3p consists of Mr. Heenan's largely normal mental-status examinations. The regulations do not permit the ALJ to reject a claimant's statements about the intensity and persistence of symptoms or about the effect those symptoms have on the claimant's ability to work solely because the available objective medical evidence does not substantiate those statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Thus, the ALJ's errors are not harmless, and the case must be remanded. *Ulman*, 693 F.3d at 714.

35

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** the matter for further proceedings. On remand, the ALJ is to reevaluate the conclusions concerning medical improvement and noncompliance with prescribed treatment, and determine how that reevaluation impacts the assessment of the consultative examiner's medical opinion.

Dated: May 28, 2025

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge. Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice.** *See United States v. Wandahsega,* **924 F.3d 868, 878-79 (6th Cir. 2019).**